Case No. 16-_____

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STEPHEN A.  PARSON, ET AL.       )
                                              )

V.                                     )
                                              )

JAMES B. ALCORN, ET AL.        )

## EMERGENCY MOTION TO A SINGLE JUDGE
## FOR INJUNCTION PENDING APPEAL

Pursuant to Federal Rule of Appellate Procedure 8, Appellants-Plaintiffs ("Plaintiffs") respectfully move Your Honor for an injunction pending appeal, enjoining the use of the Republican loyalty oath in the state-run, state-funded 2016 Virginia Presidential Primary. Alternatively, Plaintiffs move for an administrative injunction, enjoining the State Board of Elections from including the Republican loyalty oath form in any mailed ballots (which are scheduled to be mailed beginning today) until further order of the Court.

As the district court found, the State Board of Elections ("SBE") is using different forms for different voters in the Republican Primary.  Some voters will be told they cannot vote if they do not sign the loyalty oath.  Order of Jan. 14, 2016 (Page ID# 271–72).  Others will not. *Ibid.* The district court nonetheless denied Plaintiffs' motion for a preliminary injunction because it did not find they were likely to succeed on the merits.  Respectfully, the district court contradicted itself.  The court denied the motion despite recognizing "Plaintiffs' case nonetheless raises matters of significant concern as to the SBE's duties to avoid voter confusion and to preserve the integrity of, and order in, the electoral process." *Ibid.*  Those matters are precisely the basis for many of Plaintiffs' legal claims.  In part, Plaintiffs allege the bureaucratic mess the SBE has created will disproportionately deterring minority voters.  Thus, by essentially

concluding the SBE has violated its duty to maintain order, the district court has concluded Plaintiffs *are* likely to succeed on the merits.  Thus, it should have issued an injunction.

In any event, the ball is now in this Court, and immediate action is required to prevent Virginia from taking the unprecedented step—announced at the eleventh hour—of making the right to vote in the state-funded and state-administered Republican presidential primary contingent on executing a public loyalty oath pledging fealty to the Republican Party.  Absent this Court's immediate intervention, the SBE will include in every ballot mailed a loyalty oath that each voter must sign if he wishes to vote for a Republican candidate for president in the 2016 Virginia primary.  In Virginia, political parties are free to choose to hold a closed primary if they wish.   But here, the Republican Party of Virginia ("RPV") chose to have the Commonwealth of Virginia fund and administer their primary.  And under Virginia law, the state must allow all voters to participate.  By requiring voters to swear fidelity to the Republican Party, the SBE is in violation of the Constitution, federal law, and Virginia law.

The urgency of this matter cannot be overstated, and this Court's prompt action is required.  Ballots will begin going out to Virginia voters today.  Once the ballots are sent, the harm will have occurred and cannot be undone.  In order to preserve the integrity of Virginia's election; to ensure voters are not disenfranchised; and to prevent violations of the Constitution, federal law, and Virginia law, Plaintiffs respectfully ask Your Honor to enjoin the use of the Republican-loyalty oath pending appeal pursuant to Federal Rule of Appellate Procedure 8(a).

## FACTS AND PROCEDURAL HISTORY

As the district court found, different voters in Virginia will receive different forms: "Testimony during the preliminary hearing revealed that the SBE's in-person voting document

differed from that already sent to some absentee voters.  The absentee ballot enclosure notifies voters that the 'statement shall be a requirement of [the voter's] participation' and seeks a signature to 'ensure' that a ballot 'can be counted.'"  Order of Jan. 14, 2016, at pp. 1–2 (Page ID# 271–72).  In addition, testimony "established that the SBE, and not the Republican Party of Virginia, added language to the in-person voter document saying '[a]ny voter refusing to sign the statement form cannot vote in this Republican Party nominating process.'"  *Ibid.*  These forms were created by bureaucrats under a shroud of secrecy.  It has taken this lawsuit just to uncover the fact that the SBE is using two different forms.  And to this day, the SBE has not given the *public* any guidance or explanation regarding this oath requirement.  This Court cannot bless the SBE's actions.  It cannot permit different voters to face different requirements, nor can it permit state bureaucrats to create useless impediments to voting.

To offer just a flavor of the atmosphere in Virginia right now.  This loyalty oath requirement is threatening to shutter schools on March 1.  School districts are considering increasing security measures on primary day out of a concern of voter backlash to the oath. Antonio Olivo, *Fearing Anger from Trump Voters, Va. School District May Close for the Primary*, Washington Post (Jan. 12, 2016).[1]  One school district is considering keeping kids home on primary day.  *Ibid.*  As Fairfax County's Electoral Board Chairman put it, "If you say: 'I don't want to do it,' I have to say: 'You don't get a ballot. . . . That's about as contentious as anything we can possibly be doing in a polling place on election day."  *Ibid.*  So not only is the SBE and the RPV threatening to disenfranchise Virginia voters, they are also risking the safety of school children.

---

[1]    https://www.washingtonpost.com/local/virginia-politics/fairfax-considers-closing-schools-on-contentious-super-tuesday-elections/2016/01/12/bbfcc564-b94a-11e5-829c-26ffb874a18d_story.html

Virginia will hold its Republican Presidential Primary on March 1, 2016.  But in-person absentee voting begins on January 15—tomorrow—and the mailing of absentee ballots begins on January 14—today.   Under Virginia law, the RPV has a choice: if they wish to have a closed, Republicans-only nomination process, they can call and a hold a convention, and use a variety of party-funded, party-run processes to ensure only members of the political party participate in the selection process, and nominate who they deem to be sufficiently "Republican."  But if they want Virginia taxpayers to fund and administer the primary, then state law requires an open primary, where "each registered voter of the Commonwealth shall be given an opportunity to participate in the presidential primary of the political party."  Code of Virginia § 24.2-545.  As the Fourth Circuit explained, "a party is free to select from various methods of nomination in which it can exclude voters who do not share its views. . . .   It is only when the party chooses to hold a primary operated and funded by the state that it *must allow all voters to participate*." *Miller v. Brown*, 503 F.3d 360, 368 (4th Cir. 2007) (emphasis added).

Despite the law, the RPV requested the SBE require a form that said "My signature below indicates that I am a Republican."  Sometime later, the SBE created the following forms behind closed doors.   This one will be required for voters who vote in person on March 1:

Commonwealth of Virginia

Republican Presidential Primary
Tuesday, March 1, 2016

NOTICE TO VOTER

Section 24.2-545 of the Code of Virginia allows the political party holding a primary to determine requirements for voting in the primary. The Republican Party of Virginia has determined that the following statement shall be a requirement of your participation. Any voter refusing to sign the statement form cannot vote in this Republican Party nominating process.

STATEMENT

## My signature below indicates that I am a Republican.

_____          _____
Signature of Voter*                                           Printed Name of Voter*

_____          _____
Email Address                                                  Phone

*Required

SBE-545(A)                                                                                              REV 12/15

A different form is being sent to mail-in voters:

Commonwealth of Virginia

Republican Presidential Primary
Tuesday, March 1, 2016

NOTICE TO VOTER

Section 24.2-545 of the Code of Virginia allows the political party holding a primary to determine requirements for voting in the primary. The Republican Party of Virginia has determined that the following pledge shall be a requirement of your participation. *To ensure that your ballot can be counted, please sign and print your name below and include this completed pledge alongside the Ballot(s) envelope inside the pre-addressed return envelope. Do not place this form inside the Ballot(s) envelope.*

PLEDGE

## My signature below indicates that I am a Republican.

_____          _____
Signature of Voter*                                           Printed Name of Voter*

_____          _____
Email Address                                                  Phone

*Required

SBE-545(A)_AB                                                                                       REV 12/15

The key difference in the forms is that the in-person form says: "Any voter refusing to sign the pledge form cannot vote in this Republican Party nominating process."  That language, as Mr. Cortes, the Commissioner of Elections, admitted  was a creation of bureaucrats in Richmond. *See* Order of Jan. 14, 2016, at pp. 1–2 (Page ID# 271–72).  The RPV never asked for that language to be included.  The forms also differ in calling the oath a "pledge" or "statement." Further, Mr. Cortes has testified in an affidavit that he sent guidance to election officials (which seems to be unavailable to the public) on December 15, the day *before* the SBE "approved" the loyalty oath form.  Declaration of Edgardo Cortes 2 (PageID #: 160).  It is a fundamental tenet of state and federal administrative law that administrative deliberations must transpire in public view; yesterday confirmed, though, that all the relevant decisions about the form were made in a smoky backroom.

In any event, the goal of the oath is clear.  It is to stop anyone who is not a self-described, unequivocal Republican from voting in the primary.   As John Findlay, RPV's Executive Director, put it: "The purpose of the Statement is to build our Party and prevent Democrats from voting in the March 1st Republican Presidential Primary."  Email from John Findlay to "Unit Chairs" (Dec. 29, 2015 at 4:47 p.m.).  But that is precisely what the RPV cannot do because it has elected to use state money and state infrastructure to fund and administer its primary.  And by excluding everyone whom the party deems to be insufficiently Republican, minority voters will be disproportionately excluded.

The SBE has not provided much guidance on the oath.  They have instead left enforcement of the oath to local election boards, and, ultimately, to volunteers.  There are no instructions on how many forms should be available on Election Day, nor are forms available in other languages (except in Fairfax County, where a Spanish-language form will apparently be

available).  Moreover, at the hearing before Judge Lauk yesterday, the SBE was unsure how to answer simple questions: What form will be sent to absentee voters?  Which one will be given to in-person voters?  Which form did the SBE approve?  Is this requirement an oath?  But most troubling, who introduced the additional language on the form?  In particular: "Any voter refusing to sign the pledge form cannot vote in this Republican nominating process"—language the Republican Party of Virginia ("RPV") never asked the SBE to include and that we now know is false.  This bureaucratic confusion, uncertainty, and red tape is precisely the sort of chaos that deters minority voters from voting.  *See* Ben Cady & Tom Glazer, Voters Strike Back: Litigating Against Modern Voter Intimidation, 39 N.Y.U. REV. OF L. & SOC. CHANGE 173, 178 (2015).

Voters are understandably dismayed, but they are joined by well-established Republicans who agree that this exclusionary, loyalty-oath scheme is wrongheaded. For example, the Goochland County Republican Committee has resolved it "strongly objects to the use of a statement of a party affiliation in the March 1, 2016 Virginia Presidential Primary."  Resolution, Goochland County Republican Committee (Dec. 30, 2015).  And it has requested that the RPV "reconsider and, as in prior years as recently as 2012, withdraw their request to the State Board of Elections for use of the statement of party affiliation." *Ibid.*  Indeed, even Republicans who once supported the affiliation statement have changed their mind. Former First District Chairman Russ Moulton originally supported the RPV's decision to require a statement of affiliation prior to voting in the primary.  But he now says, "I have come to believe with deeper understanding [the affiliation statements] are a Mistake."[2]

Two crucial facts were uncovered at yesterday's hearing on plaintiffs' motion for a preliminary injunction.  *First*, the court heard firsthand that *the State* is the source of the

---

[2]  Moulton: Time To Pull The Plug On The Loyalty Oath, BEARING DRIFT, *available at* http://bearingdrift.com/2015/12/30/moulton-time-to-pull-the-plug-on-the-loyalty-oath/ (last visited Jan. 13, 2016) ("Moulton").

language: "Any voter refusing to sign the pledge form cannot vote in this Republican nominating process." The SBE did not "approve" the form submitted by the RPV as required by Virginia law. *See* § 24.2-545. Instead, it introduced language on its own initiative. According to Mr. Cortes, Virginia's Commissioner of Elections (who testified yesterday) state bureaucrats simply used what they had used before in 2012. But the form from 2012 (which was going to require voters to say they would support the party's nominee) was never actually used; the RPV withdrew their request in the face of litigation back then. So there is no merit to the claim that by adding in language the RPV did not request somehow maintains SBE consistency.

In addition, Mr. Cortes testified that on December 16, 2016, the Executive Director of the RPV requested the SBE change the word "pledge" to the word "statement." That request came within 90 days of the election and thus the Board was powerless to approve the request. *See* § 24.2-545. The SBE claims it has the power to produce forms, but that power is surely limited to the ability to format, not introduce substantive changes to what political parties requested.

*Second*, for the first time yesterday, after countless pages of briefing and nearly two hours into the hearing, the court heard that provisional ballots are going to be provided at the polls on March 1, 2016. The SBE decided this, according to Mr. Cortes, last Friday—only *after* this suit was filed. This development makes the in-person voting form demonstrably false; if a voter does not sign he *will* be permitted to vote provisionally, contrary to what the form actually says.

Finally, as to timing, it is entirely the fault of the SBE and the RPV that this motion is arriving so close in time to absentee ballots being mailed (today, January 14), being made available for in-person voting (tomorrow, January 15), and being made available for regular voting (March 1). The SBE did not act on the RPV's request to include a test oath until December 16, and the final form differed substantially from the one approved by the RPV. In

fact, the actual form approved by the SBE does not appear to have been made public until the morning of the SBE's vote. The RPV's initial vote to ask that a loyalty oath be instituted was not well-publicized (and appears not to have been done in compliance with Republican Party rules regarding public notice), and was not submitted to the SBE for at least two months. And Plaintiffs, through counsel, encouraged the SBE and the RPV to abandon the oath requirement and avoid litigation. Moreover, media coverage of the test oath has only now reached its crescendo, bringing the unlawful requirement to the fore, and alerting voters.

Earlier today, the district court denied the Plaintiffs' motion by written order, and subsequently denied their motion for an injunction pending appeal. Plaintiffs have already filed a Notice of Appeal with the district court. If left undisturbed, Judge Lauck's denial of the Plaintiffs' motion for an injunction pending appeal will allow the loyalty oath to be included with ballots, which will be mailed today and made available to Virginians who vote in-person tomorrow. As former district chairman Moulton put it: "It's time to pull the plug on this disaster." *Moulton*.

## LEGAL STANDARD

Federal Rule of Appellate Procedure 8(a)(2) authorizes a motion to this Court to grant an injunction pending appeal. In accord with Rule 8(a)(2)(D), Fourth Circuit Local Rule 27(e) allows a party to make a motion by application to a single Judge of this Court "in exceptional circumstances where action by a panel would be impractical due to the requirements of time." This case presents such circumstances, thus necessitating this emergency motion. Absentee ballots for the 2016 Virginia Republican Presidential Primary must be made available for in-person use tomorrow (January 15) and by-mail use today (January 14). This Court's immediate

action is necessary to enjoin the Republican loyalty oath before it is dispersed to Virginians and irreparably infects the election process.

Four factors determine whether an injunction would be appropriate here: (1) Is the plaintiff likely to succeed on the merits? (2) Is the plaintiff likely to suffer irreparable harm in the absence of preliminary relief? (3) Does the balance of equities tip in the plaintiff's favor? And (4) Is an injunction in the public interest? *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). These factors clearly weigh in Plaintiffs' favor.

## ARGUMENT

"Test oaths are notorious tools of tyranny. When used to shackle the mind they are, or at least they should be, unspeakably odious to a free people." *Wieman v. Updegraff*, 344 U.S. 183, 193 (1952) (Black, J., concurring). When used as a condition on voting they are also odious to the law.

## I. PLAINTIFFS WILL LIKELY SUCCEED ON THE MERITS

The "right to vote freely for the candidate of one's choice is the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Virginians' right to vote is at stake in this case, and Plaintiffs have strong arguments that the oath is unlawful under the Voting Rights Act, unconstitutional under the First and Fourteenth Amendments, and that it violates Virginia law.

### A. Virginia's Loyalty Oath Violates the Voting Rights Act.

The multiple loyalty oath forms, the bureaucratic red tape, and chaos the forms will create on election day constitute impermissible voter intimidation and further the oath is an illegal "voting qualification" under the Voting Rights Act ("VRA"). *First*, the oath form

- 10 -

requires an unequivocal, forced statement demanded under color of state law. Further, the form is demonstrably false, as we learned at yesterday's hearing. Voters who refuse to sign the form on March 1 will be able to cast provisional ballots. Thus, the form's claim that "Any voter refusing to sign the statement form cannot vote in this Republican Party nominating process" is false. In short, the false form(s) attempts to intimidate voters who are not Republican (disproportionately minorities) into not voting. Section 11(b) of the VRA explicitly forbids this scheme. 52 U.S.C. § 10307(b).

The history of the United States is replete with unfortunate examples of voter intimidation. *See Burson v. Freeman*, 504 U.S. 191, 200–07 (1992). Voter intimidation led to passage of the KKK Act and the VRA. *See McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) (discussing the KKK Act); *James v. Humphreys Cnty. Bd. Of Election Commr's*, 384 F.Supp. 114, 118 (N.D. Miss. 1974) (discussing the VRA). And until the middle part of the last century, Blacks attempting to vote faced violence and economic reprisal. *United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961). Though voter intimidation does not usually take such explicit forms today, it remains a perennial problem. Today minority voters are deterred from voting through subtler attacks (this trend toward subtler intimidation is similar to that which has occurred in the employment context). *See* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. REV. OF L. & SOC. CHANGE 173, 178 (2015). Contemporary voter intimidation takes the form of "aggressive poll-watching, anonymous threats of harm, frivolous and excessive voter registration challenges," *ibid.*, and as this case demonstrates, unnecessarily threatening forms which contain misstatements of law and fact.

As to the form itself, it contains clear and misleading threats (and as we now know it is false). As to its falsity, for the first time yesterday, we heard that provisional ballots are going to be provided at the polls on March 1, 2016. The SBE decided this, according to Mr. Cortes, last Friday—only *after* this suit was filed. This development makes the in-person voting form demonstrably false; if a voter does not sign he *will* be permitted to vote provisionally, contrary to what the form actually says. In addition, the form cites Virginia Code, making it appear like the form is required under penalty of law. It also contains the ominous threat: "Any voter refusing to sign the statement form cannot vote in this Republican Party nominating process." Oddly, the form asks for information (email addresses and phone numbers) that has absolutely nothing to do with the ability to vote—yet in the fine print, it purports to say such information is not required. Worse, the form overstates and misstates state law. The form sternly states that state law "allows the political party holding the primary to determine requirements for voting in the primary" without any sort of qualification or limitation. This is false—the party is not holding the primary, the state is holding the primary, paid for by the taxpayers. To the extent the party wishes to hold a closed process, state law most certainly permits that, but the party has chosen a different path. Thus, a required form cannot claim that the party is holding something that is in reality held by the state.

Similarly, state law does not allow the party to determine all requirements to vote, nor could it in such a broad fashion. Although state law does permit the party to choose whether it will have a closed convention or a state-sponsored open primary, and permits to party to ask that voters state that they will support the party's nominee, that is a far cry from what the SBE form is demanding here. The party does not get to decide who is and who is not an acceptable voter among those otherwise rightfully entitled to vote. A loyalty oath that forces a voter to declare

himself a Republican without limitation or definition, on the spot, the day of voting while at the polling place is different in kind from the more mundane statements used by the party in the past (for example, asking that a voter confirm that he or she has not voted in another primary election).  Here, color of state law is being used to make claims that can only serve to intimidate, and such power cannot be used to intimidate those who are rightfully entitled to vote.  This violates the Voting Rights Act.  52 U. S. C. § 10307(b).

*Second*, the oath is an illegal voting qualification.  To protect the right to vote, Section 2 of the VRA prohibits any "voting qualification . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U. S. C. § 10301(a).  Violations of the VRA can "be proved by showing discriminatory effect alone."  *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986).  A discriminatory effect is present when the voting qualification "interacts with social and historical conditions to cause an inequality in the opportunities" for different races to vote for their preferred candidate.  *Id.* at 47.

There are two elements to a discriminatory effect claim.  First, the challenged standard "must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015). Second, that burden must "in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class."  *Ibid.*  The loyalty oath satisfies both of these elements and is therefore illegal.

The oath will inevitably discriminate against Black voters.  The loyalty oath will produce long lines and interminable waits for all voters, but that will hit Blacks and Hispanics especially

hard. As one commenter has already noted, the loyalty oath will be "a nightmare to implement." *Oath Required to Vote in Virginia Republican Presidential Primary*, NBC29, (Dec. 16, 2015) (statement of Olga Hernandez, League of Women Voters).[3] Because this requirement is untested and neither the RPV nor the SBE has provided any concrete information regarding the details of how this oath is to be implemented—nor have they given any instructions on how many to print—the oath looks certain to create long lines as poll volunteers and election officials try to enforce the new requirement. Election volunteers have already warned "the [oath] will create long lines." *Ibid.*

Long lines are vexing for all voters, but they have a disparate impact on Blacks and Hispanics. Long lines require voters to expend time that they could have spent doing something productive. While wealthy individuals can perhaps afford to wait hours to vote—as some Virginians had to do in the 2012 Presidential election—lower-income individuals working hourly jobs do not have that luxury. *See* Carol Morello and Jeremy Borden, *In Battleground Virginia, Long Waits at the Polls*, WASHINGTON POST (Nov. 6, 2012) (noting voters were waiting up to four hours to cast their ballots).[4] And because minorities make up a disproportionate percentage of lower-income Virginians, these long lines will discourage them from voting at a higher rate than Whites. *See* The Henry J. Kaiser Family Foundation, *Poverty Rate by Race/Ethnicity* (noting in 2013, 6% of Whites were living in poverty as compared to 23% of Blacks and 15% of Hispanics).[5] The harm here is multiplied by the lack of information provided

---

[3]    http://www.nbc29.com/story/30770194/oath-required-to-vote-in-va-republican-presidential-primary.

[4]    https://www.washingtonpost.com/local/virginia-politics/in-battleground-virginia-all-eyes-will-be-on-races-for-president-senate/2012/11/05/69eb061a-2770-11e2-b2a0-ae18d6159439_story.html

[5] http://kff.org/other/state-indicator/poverty-rate-by-raceethnicity/

regarding the implementation of this form—apparently, it is being left to local election officials and volunteers to implement.  The Voting Rights Act demands much, much more.

Beyond the lines the oath will undoubtedly generate, however, the oath is bureaucratic red tape that will itself likely disproportionately deter minority voters from voting in the Republican Primary. The target of the RPV and the SBE—the undesirables—are voters who have "little experience with public institutions and little time to navigate complex election bureaucracies." Cady, *supra*, at 178.  And these individuals are "likely to forgo voting in the face of increased obstacles." *Ibid.*  Thus, when a minority voter, unfamiliar with voting—particularly in primaries—arrives to cast a vote and finds an interminable line, a threatening form, a required loyalty oath, and confused bureaucrats who cannot answer simple questions because the higher-ups provided no guidance, the minority voter will likely leave the precinct without casting a vote.

The RPV's loyalty oath also imposes the burden of fear and backlash.  According to the RPV, after the primary it plans to data mine the signed forms.  Personal information such as an email address and phone number are requested, and fine micro-print that such information is not required is no answer (that a government form that is a mandatory prerequisite to voting on election day includes optional information speaks volumes).  Not only does that data mining violate voters' privacy; it will disproportionately discourage Black voters from turning out to the primary.  Given Virginia's long and unfortunate history of racially polarized voting—discussed further below—if the Republican Party were to release the names of Black voters who had publicly proclaimed that they "are Republicans," those individuals could face backlash from their communities.  *See NAACP v. Alabama*, 357 U.S. 449, 462 (1958) ("[O]n past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public

hostility."). It is unlikely that White voters face a comparable threat of reprisal. Thus, the loyalty oath again disproportionately affects minorities.

The loyalty oath also amounts to a literacy test in disguise. Other than in Fairfax County, the forms will apparently be available in English only. Those who do not speak or read English will be unable to understand the form or know what they are being asked to sign. And on average, a higher percentage of Hispanics (and other minorities) do not speak or read English than White voters. Thus, the burden of the RPV's planned English-only form will fall much more heavily on Hispanic and other minority voters than others—amounting to a declaration that minority voters are unwelcome in the Republican primary. Given that the VRA explicitly aims to protect citizens "from environments in which the dominant language is other than English," it is clear that the VRA forbids the RPV's planned loyalty oath. 52 U. S. C. § 10303(f)(1-2).

The burden the loyalty oath would inflict on voters is obviously "linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *League of Women Voters*, 769 F.3d at 240. Virginia has a sordid history of discrimination against Blacks and Hispanics. *See Gingles*, 478 U.S. at 36 (relevant factor under Section 2 is "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process"). Even after the 200-year-old practice of slavery ended in Virginia, the state continued to discriminate against Black citizens. It imposed a poll tax until 1966 and a literacy test until 1974. *Harper v. Va. State Bd.*, 383 U.S. 663, 666 (1966); *Virginia v. United States*, 386 F. Supp. 1319 (D. D.C. 1974), *aff'd*, 420 U.S. 901 (1975). During that same period, Virginia forbade miscegenation and fought school desegregation.

*Loving v. Virginia*, 388 U.S. 1 (1967); *Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1356 (4th Cir. 1989).

Virginia likewise has a long, sad history of polarized voting, which is evidence of how the RPV's planned loyalty oath is linked to historical discrimination. *See Gingles*, 478 U.S. at 36 (holding another relevant factor under section 2 of the VRA is "the extent to which voting in the elections of the state or political subdivision is racially polarized"). For example, in 1989 the Fourth Circuit recognized that "the white majority [in Norfolk] normally voted sufficiently as a bloc to defeat the combined strength of strong minority support plus white crossover votes for minority preferred candidates who sought a second seat on the [city] council." *Collins v. City of Norfolk*, 883 F.2d 1232, 1240 (4th Cir. 1989). And in 2012, Mitt Romney won 61% of the White vote, while Barack Obama won 93% of the Black vote and 64% of the Hispanic vote, confirming that the balkanization of voters in Virginia continues today. *See* NBC News, *Virginia Presidential Election Results*.[6]

Minorities continue to feel the effects of discrimination in Virginia even beyond voting. *See Gingles*, 478 U.S. at 36 (another factor under Section 2 is "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process"). Unemployment rates and poverty rates for Blacks and Hispanics exceed Whites. *See* U.S. Census Bureau, *2009-2013 American Community Survey 5-Year Estimates*. Blacks are less likely to have a college education than Whites. *See* Stella Ogunwole, *et al.*, *The Population with a Bachelor's Degree or Higher by Race and Hispanic Origin: 2006–2010*, American Community Survey Briefs (2012). Hispanics are less likely to own a house. Robert Callis & Melissa Kresin, *Residential Vacancies and Homeownership in the Third Quarter 2015*,

_____

[6] http://elections.nbcnews.com/ns/politics/2012/virginia/president/#.VncSwRUrKUk

U.S. Census Bureau News 9 (2015).  And these "social and historical conditions" set the background against which the Republican Party operates and the loyalty oath exacerbates these ongoing effects and will disproportionately deny Blacks and Hispanics their opportunity to vote in Virginia's Republican primary.  *Gingles*, 478 U.S. at 35.

As a final note, neither the RPV nor the SBE has provided any meaningful explanation as to how this loyalty oath will be administered.  This lack of responsiveness is the one of the factors that Congress explicitly said is to be considered when applying the Voting Rights Act.  *See* S. Rep. No. 97-417, 97th Cong., 2d Sess. (1982), pp. 28–29.  Given the SBE has never imposed this sort of loyalty oath, and local elections officials have not had to administer such a process in recent memory, a vast number of questions remain, and such chaotic uncertainty can easily lead to voters being disenfranchised:

1. Does the form have to be signed before voters are given the ballot, simultaneously with the ballot, or when they submit their ballot?

2. Who will enforce, and who will be permitted to enforce the requirement?  Local poll workers?  Partisan poll watchers?  Campaign poll watchers?  Will campaigns be permitted to even have poll watchers related to this subject at the polling place?

3. What recourse does someone have who is not allowed to vote because he or she refuses to sign the Party's form in addition to the voter rolls?  Yesterday, for the first time the SBE informed Plaintiffs (and the public) that provisional ballots will be provided.  But they have yet to answer what recourse a voter has who does not sign the form.

4. How will it be ensured that the requirement is enforced consistently across precincts, polling places, counties, and across the state?  How many of the forms will be provided to each polling location?

5. What is the procedure for voting if a polling location runs out of forms?  Must no more Republican ballots be cast?

6. How will absentee voters be provided the form?

7. What is the official response a poll worker should give if a Democratic poll watcher suggests that the Democratic primary is open, but the Republican primary is closed?  How will this response be distributed to the polling locations?

8.  Will the completed statements be compared to the voter rolls?  If so, who will be doing the data entry and audit – comparing the Statements to the actual voter records?  What will happen if the audit shows that people were allowed to vote without submitting the Statement of Party Affiliation?  Will those people be prosecuted for illegally casting votes?  Will the government poll workers be accused of allowing vote fraud?

Because the RPV has opted to have Virginia pay for and administer the presidential primary, the state "must allow all voters to participate." *Miller*, 503 F.3d at 368.   The VRA confirms as much by forbidding any voting qualification that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  § 10301(a). But the SBE has blown past that prohibition by forcing every primary voter in the Republican primary to announce that he or she is unequivocally a "Republican"—as discussed further below, it is not at all clear what this means.  That demand—made by a local election official under color of state law per the order of the SBE—is illegal.

**B.  Virginia's Loyalty Oath Violates the Equal Protection Clause.**

"[T]he power of the states to determine the manner of holding elections is limited by the Equal Protection Clause of the Fourteenth Amendment." *Socialist Workers Party v. Hechler*, 890 F.2d 1303, 1309 (4th Cir. 1989), *superseded by statute on other grounds*.  This planned loyalty oath violates that Clause in three ways.

*First*, this requirement will disenfranchise the countless voters—like Plaintiffs—who wish to vote for a candidate for President on the Republican ticket but who are unwilling to publicly declare that they are "Republicans."  As discussed further below, it is not clear what declaring oneself to be a "Republican" means—Virginia does not have party registration—but it certainly suggests that the person is committing to support every Republican candidate for every office on the ballot in November, the entire Republican Party platform, and all things Republican.  "[B]ecause most people want to keep their vote secret, many potential subscribers

- 19 -

will be reluctant to openly declare their voting preference in a nominating certificate." *Id.* at 1310.

*Second*, this requirement will disenfranchise every voter who is comfortable with having public records reflect their vote in the Republican presidential primary, but who otherwise believes the secret ballot is important. By declaring their loyalty to the Republican Party, voters are, again, publicly proclaiming their allegiance to a particular political party and all that entails. Requiring that strong political statement is a constitutionally unacceptable price for participating in democracy, particularly when state law (1) allows the party to have a Republican-only nominating convention, and absent that, requires (2) a taxpayer-funded open primary that "must allow all voters to participate." *Miller*, 503 F.3d at 368.

Plenty of people can and do support Republicans without wanting to tell the world that they are Republicans: "[S]ome individuals who have made up their minds, and who would ordinarily have no objection to stating their preferences, might be put off by the possible reaction to associating themselves with the more unpopular political groups." *Socialist Workers Party*, 890 F.2d at 1310. Given the Republican Party's 32% approval rating,[7] this category of voters— those who support a Republican candidate but who do not wish to tell the world they "are Republicans"—is likely quite high. *See also, e.g.*, *Libertarian Party of Nebraska v. Beermann*, 598 F. Supp. 57, 63 (D. Neb. 1984) ("[M]any voters have no desire to change basic political affiliations, but neither do they vote a straight political ticket in the general elections.").

*Third*, it is only those voters who seek to support a Republican candidate that "must declare" their loyalty to a "specific" political party. *Socialist Workers Party*, 890 F.2d at 1310 (quoting *Anderson v. Mills*, 664 F.2d 600, 609 (6th Cir. 1981)). "Electors who support other

---

[7] Republican Party Favorability, Pew Research Center (July 20, 2015), available at http://www.pewresearch.org/data-trend/political-attitudes/republican-party-favorability/.

candidates have to make no such public declaration" and "[t]he chilling effect that such a practice has on associational and voting rights is obvious." *Ibid.* (quoting *Anderson*, 664 F.2d at 609). Those citizens who wish to vote for a Republican candidate for President—and only those citizens—"must decide whether to sign" the Virginia-mandated form, thus "having" their "political preference clearly and unmistakably disclosed," or to "refrain from signing" and thus forfeit the chance to vote. *Ibid.* (quoting *Anderson*, 664 F.2d at 609). That will uniquely deter citizens from participating in the Republican primary, which is the only state-funded election in Virginia that requires pledging fealty to a political party as the price of participation.

Yesterday, we learned for the first time that voters who vote in person on March 1 will apparently be permitted to *not* swear fidelity and fill out a provisional ballot—which may or may not be counted. We still do not know, just as the State's Election Commissioner did not know today. Voters can then, perhaps, challenge the oath requirement and seek to have their vote counted—assuming the form does not intimidate them into not trying to vote at all. But absentee voters do not have that luxury. They are faced with the binary decision: Sign and vote, or forfeit your right to vote in the 2016 Republican Primary. Voters must be treated equally; the State cannot favor ballots cast in person over those cast before.

Against all this, there is no state interest that is compelling enough to justify turning away voters who want to participate in the political process without pledging allegiance to a political party. Foremost, Virginia's planned loyalty oath is not necessary to protect "the integrity of the nominating process" by "confin[ing] voters to supporting one party and its candidates in the course of the same nominating process." *Am. Party of Texas v. White*, 415 U.S. 767, 786 (1974). *That* goal could be accomplished with a simple statement affirming that the voter has no intention of participating in any other party's primary election that year. That simple

confirmation would fully protect the legitimate interest in limiting each voter's participation to a single primary election without disenfranchising the many voters who are unwilling to sign public declarations of unfettered loyalty to the Republican Party.  And that simple statement is, of course, precisely what RPV has used in the past.

Beyond that, the SBE's "interest in making voters disclose their voting preferences is neither legitimate nor strong, and in fact serves no purpose whatever, except to have a chilling effect on the voter." *Socialist Workers Party*, 890 F.2d at 1309.  Just as the SBE could not adopt a rule that explicitly excluded African American voters from participating in its primary, *see Smith v. Allwright*, 321 U.S. 649 (1944), or create a pre-primary by another name that is intended to exclude minority voters, *Terry v. Adams*, 345 U.S. 461 (1953), it cannot adopt a policy that has the sole purpose of deterring registered voters from exercising their constitutional right to vote because it causes "a violation of the potential [voters'] First and Fourteenth Amendment rights." *Socialist Workers Party*, 890 F.2d at 1310.

**C.    Virginia's Loyalty Oath Violates the First Amendment.**

In addition to violating the Equal Protection Clause, Virginia's planned loyalty-oath requirement violates the First Amendment and the Fourteenth Amendment more generally.  The SBE's oath requirement is subject to strict scrutiny and that it cannot survive.  "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  *W. Va. Bd. Of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).  The officials at the SBE, no matter how high they think they are, cannot foist this oath requirement onto Virginians.

The First Amendment forbids conditioning a citizen's right to vote in the state-funded, state-administered election for the Republican candidate for President on a declaration that he or

she is a "Republican." Virginia's planned "loyalty oath" is far more invasive and burdensome on First Amendment freedoms than merely requiring party registration as a condition of participating in a party primary. Registering to vote as a Republican is ministerial, unexplained affiliation with the party for purposes of voting in primary elections; it is no more burdensome or invasive than simply casting a primary vote itself. *See, e.g.*, *Clingman v. Beaver*, 544 U.S. 581, 590 (2005) ("In general, anyone can 'join' a political party merely by asking for the appropriate ballot at the appropriate time or (at most) by registering within a state-defined reasonable period of time before an election." (quotation omitted)). Virginia's requirement is much more than that. It requires every participant in the Republican Primary to sign the oath, after arriving at the polling place, and as a precondition to vote in what has otherwise been described as an open primary, which is then made available for all the world to see.

The SBE's oath requirement is subject to strict scrutiny, and that it cannot survive. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. Bd. Of Ed. v. Barnette*, 319 U.S. 624, 642 (1943). The officials at the SBE, no matter how high they think they are, cannot foist this oath requirement onto Virginians.

"'Depend[ing] upon the extent to which a challenged regulations burdens First and Fourteenth Amendment rights,' the regulation will either face strict scrutiny review or a more deferential standard of review." *Sarvis v. Judd*, 80 F. Supp. 3d 692, 698 (E.D. Va. 2015) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). And state requirements that "impose a severe burden" upon protected rights, *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014), "must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at

434 (internal quotation marks omitted).  Trying to evade their burden, which they cannot carry, Defendants suggest there are no "protected right[s] upon which the RPV ballot requirement impinges."  Mem. In Supp. Of Mot. To Dismiss, at 11 (PageID # 92).  The SBE instead offers the odd solution that "the voter who feels himself disenfranchised should simply join the party." *Id.* (quoting *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000)).  That is impossible in Virginia because there is no party registration.  And this harkens back to the answer to literacy tests: just learn how to read.   In any event, joining the Republican Party would still not allow Plaintiffs to vote for their favored candidate in the Republican Primary.  As the SBE's own form states, *signing the form* is required:   "Any voter refusing to sign the statement form cannot vote in this Republican Party nominating process."  Thus, any voter, even a card-carrying Republican cannot vote unless he signs the form—a form that even asks for a voter's email and phone number.

It is difficult to imagine a more politically charged statement than publicly proclaiming oneself to be "a Republican."  Rather than requiring voters to affirm that they are voting only in the Republican Primary or that they are (for now) supporting Republican candidates, Virginia's loyalty oath would require voters to self-identify as "Republicans"—a self-categorization that brings with it over 150 years of history and policy positions.  Even voters who generally support Republican candidates and who generally vote in Republican primaries might be uncomfortable telling the world that they *are Republicans*, as opposed to free-thinkers who *often support* Republicans.  And that burden is even heavier, of course, for voters who are not historically Republicans but who wish to take advantage of the "opportunity to participate in the presidential primary of the political party," Va. Code Ann. § 24.2-545, to vote for their candidate of choice.

The Supreme Court long ago explained, "The right to vote can neither be denied outright, *Guinn v. United States*, 238 U.S. 347, *Lane v. Wilson*, 307 U.S. 268, nor destroyed by alteration of ballots, *see United States v. Classic*, 313 U.S. 299, 315, nor diluted by ballot box stuffing, *Ex parte Siebold*, 100 U.S. 371, *United States v. Saylor*, 322 U.S. 385." *Reynolds*, 377 U.S. at 555. Nor can it be made contingent on public declarations identifying oneself as a total partisan and all that entails on election day while in the polling place, for the first, time, as a precondition to voting in what is supposed to be an open primary—such identification that, again, goes beyond mere membership or affiliation.

"[F]reedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. FAIR*, 547 U.S. 47, 61 (2006) (citing *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943), and *Wooley v. Maynard*, 430 U.S. 705, 717 (1977)). And by "telling" Plaintiffs what they "must say" in order to cast a ballot for the candidate of their choice in the state-funded Republican Presidential Primary, Virginia has violated their First Amendment right to espouse only the political messages they choose. They are being forced to adopt all aspects of being "Republican"—the good, the bad, and in their eyes, the ugly.

This would, indeed, be true even if Plaintiffs did not have a right to vote in the Republican Primary. It is well-established that governments "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *FAIR*, 547 U.S. at 59; *see also, e.g.*, *Keyishian v. Bd. of Regents of the Univ. of N.Y.*, 385 U.S. 589, 606 (1967) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." (quotation omitted)). Having chosen "to hold a primary operated and funded by the state," the RPV cannot make allowing "voters to participate," *Miller*, 503 F.3d at 368,

contingent on those voters surrendering their First Amendment right to refrain from proclaiming themselves to be Republicans. Governments cannot "force citizens to confess by word or act their faith" in a particular political party, *Barnette*, 319 U.S. at 642, and they cannot impose that requirement as the cost of accepting the "benefit" of voting for the candidate of one's choice in a state-funded primary election.

This is particularly true here, where the demanded oath extends far beyond the narrow issue of which candidate should serve as the Republican candidate for President. In the analogous context of conditioning federal funding on speech restrictions, the Supreme Court has consistently invalidated restrictions that "reach outside" the funding to restrict unrelated speech. *Agency for Intern. Development v. Alliance for Open Society Intern., Inc.*, 133 S. Ct. 2321, 2330 (2013). Here, Virginia's requirement forces every person who wishes to cast a vote for the Republican candidate *for President* to *both* pledge loyalty to this year's eclectic slate of Republican presidential candidates *and* pledge his or her loyalty to the *entire Republican Party* without reservation or limitation, its platform and its reputation and history. Each voter must tell the world that "I am a Republican" without any qualification, limitation, or tailoring to the specific primary election at issue. Requiring every voter to make that extraordinarily broad statement far outstrips Virginia's and the RPV's narrow interest in limiting the Republican Primary to voters who actually support one of the Republican candidates and who are not voting in other parties' primaries. It thus violates the First Amendment, as well as the Fourteenth.

### D. Virginia's Loyalty Oath Violates State Law.

In promulgating the oath form, the SBE violated Virginia law. Thus, if the Court wishes to avoid Plaintiffs' federal claims, it can enjoin the SBE from using any oath form because the form violated Virginia law.

Virginia law empowers political parties to establish "requirements" to participate in primaries, but those requirements must be "approved by the State Board." Code of Virginia § 24.2-545. And while the requirements can include "the signing of a pledge by the voter of his intention to support the party's candidate," the requirements must be "determined at least 90 days prior to the primary date and certified to, and approved by, the State Board." *Ibid.*

But here, the SBE violated that law in three ways. *First*, it did not approve the oath requirement submitted by the RPV. Instead it wrote its own, more intimidating form. *Second*, the SBE's "approval" came two weeks after the 90-day deadline. *Third*, the SBE created a party-loyalty oath that differs and is distinguishable from the one oath permitted by statute.

*First*, the SBE did not approve the form submitted by the RPV. Section 24.2-545 provides: "The requirements applicable to a party's primary shall be determined at least 90 days prior to the primary date and certified to, and approved by, the State Board." *Ibid.* In other words, the *party* must *propose* the requirements and the *SBE* must *approve* the requirements. The SBE cannot create its own political requirements for participation in the primary. But that is precisely what the SBE did here.

The RPV certified the following form to the SBE:



### Statement of Republican Party Affiliation

Virginia does not register voters by political party.  Virginia law allows a political party to ask that voters in its Presidential Primary affiliate with that party.

My signature below indicates that I am a Republican.

| | |
|---|---|
| _____ | _____ |
| Printed Name* | Signature* |
| _____ | _____ |
| Email Address | Phone |
| *Required | |

Property of the Republican Party of Virginia

But that is not what the SBE "approved."  Instead, the resulting form is more intimidating in its language and is also false:

Commonwealth of Virginia

Republican Presidential Primary
Tuesday, March 1, 2016

NOTICE TO VOTER

Section 24.2-545 of the Code of Virginia allows the political party holding a primary to determine requirements for voting in the primary. The Republican Party of Virginia has determined that the following statement shall be a requirement of your participation. Any voter refusing to sign the statement form cannot vote in this Republican Party nominating process.

STATEMENT

## My signature below indicates that I am a Republican.

_____        _____
Signature of Voter*                                 Printed Name of Voter*

_____        _____
Email Address                                          Phone

*Required

SBE-545(A)                                                                                           REV 12/15

For example, the new form cites the Virginia Code, making it appear like the form is required under penalty of law.  Similarly, the color of state law is further emphasized by the inclusion of "NOTICE TO VOTER"— capitalized throughout and underlined for effect.  The form also contains the threat that "[a]ny voter refusing to sign the statement form cannot vote in this Republican Party nominating process."  That statement was not present in the form developed by the RPV.  The form also misstates fact and law when it says state law "allows the political party holding the primary to determine requirements for voting in the primary."  This representation is patently false.  The RPV is not administering the primary, the state is.  And state law does not allow the party to determine all requirements to vote, nor could it in such a broad fashion.  In addition, yesterday, for the first time after countless pages of briefing and nearly two hours into the hearing, the Court heard that provisional ballots are going to be provided at the polls on March 1, 2016.  The SBE decided this, according to Mr. Cortes, last Friday—only after this suit was filed.  This development makes the in-person voting form

demonstrably false; if a voter does not sign he will be permitted to vote provisionally, contrary to what the form actually says.

In any event, Virginia law only allows the SBE to "approv[e]" requirements submitted by the political parties.  § 24.2-545.  It does not permit the SBE to make up its own politically-based requirements for voter participation.  And because the SBE did not "approve" the form submitted by the RPV, but instead drafted its own, it has acted *ultra vires* and its action should be set aside.

*Second*, the SBE did not comply with the 90-day requirement in creating the oath form.  The SBE must "approv[e]" any requirements "at least 90 days prior to the primary date."  *Ibid.*  But the SBE "approved" its form on December 16, a mere 76 days before the primary, in clear violation of the 90-day rule.  The fact that the RPV certified a different form two months prior is irrelevant.  The SBE did not approve that form, thus, the RPV's certification of the earlier form cannot serve as the triggering date for the 90-day rule.  According to Mr. Cortes on December 16, 2016, the Executive Director of the RPV requested the SBE change the word "pledge" to the word "statement."  That request came within 90 days of the election and thus the Board was powerless to approve the request.  See § 24.2-545.  The result again is *ultra vires* action.

*Third*, Virginia law authorizes political parties to require only one pledge, a pledge to support "the party's candidate."  § 24.2-545(A).  By authorizing a candidate-support pledge, the statute's clear implication is that other "pledges"—like the one at issue here—are not authorized. *See Leatherman v. Tarrant Cnty. Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) ("*Expressio unius est exclusion alterius*.").  The statute does suggest the requirement listed is merely "illustrative rather than exhaustive," *Samantar v. Yousuf*, 130 S. Ct. 2278, 2287 (2010), because the requirement follows the phrase "[t]he requirements may include," Code of Virginia § 24.2-545(A).  Nonetheless, even if the requirement is "merely illustrative, it still suggests that"

no other pledge would be required because the statute provides no illustration of requiring a statement of *party* support. *Samantar*, 130 S. Ct. at 2287; *see also Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923) ("[A] word may be known by the company it keeps.").

Not only does this interpretation comport with the text, it is compelled by the canon of constitutional avoidance. The Court must construe the Virginia statute to not permit the loyalty oath at issue here to avoid serious constitutional concerns. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). As discussed above, the loyalty oath violates the First and Fourteenth Amendments to the Constitution. *See supra* II.B and II.C. And when the constitutionality of a statute is challenged and the statute can be reasonably interpreted in two ways, a court must adopt the interpretation that saves the statute from unconstitutionality. *Skilling v. United States*, 561 U.S. 358, 406 (2010). This canon of constitutional avoidance does not require an actual violation, it requires only serious constitutional doubt. *See Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). "[V]alidly conferred discretionary executive authority is properly exercised (as the Government has proposed) to avoid serious constitutional doubt." *Ariz. v. Inter Tribal Council of Ariz.*, 133 S. Ct. 2247, 2259 (2013). Given the serious constitutional questions raised by interpreting § 24.2-545 to allow the SBE to promulgate the test oath at issue, the Court must construe the statute to not permit the oath promulgated by the SBE.

## II. EQUITABLE FACTORS

The district court explained "Plaintiffs' case nonetheless raises matters of significant concern as to the SBE's duties to avoid voter confusion and to preserve the integrity of, and order in, the electoral process.. Order of Jan. 14, 2016, at p. 1–2 (Page ID# 271–72). As the court wrote, "Plaintiffs' case nonetheless raises matters of significant concern as to the SBE's duties to avoid voter confusion and to preserve the integrity of, and order in, the electoral process. The in-

person voting procedure remains in flux to a noteworthy degree." Order of Jan. 14, 2016, at p. 3 (Page ID# 273). In particular, "during the January 13, 2016 hearing, the SBE disclosed for the first time that, as of January 8, 2016, the SBE changed the in-person voting procedure to include the use of a provisional ballot-one that likely would not be counted. The SBE stated that it will give corrected instructions to voting officials." *Ibid.* Nonetheless, the district court denied the motion because it did not believe Plaintiffs would succeed on the merits. But the district court's conclusion means Plaintiffs are likely to succeed. The bureaucratic confusion, uncertainty, and red tape is precisely the sort of chaos that deters minority voters from voting. See Ben Cady & Tom Glazer, Voters Strike Back: Litigating Against Modern Voter Intimidation, 39 N.Y.U. REV. OF L. & SOC. CHANGE 173, 178 (2015). Further, as we have shown above, this case presents serious questions of first impression that the Fourth Circuit should resolve.

As to the equitable factors, Plaintiffs will suffer irreparable harm absent an injunction. When "constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). As has already been shown, the loyalty oath amounts to an unlawful restriction on the right to vote. Since a "restriction on the fundamental right to vote . . . constitutes irreparable injury," *ibid.*, this factor weighs heavily in favor of granting the injunction. *See also Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (finding that the denial of the right to vote is "irreparable harm"). Moreover, given that absentee ballots are set to be mailed to voters today, the Court must act now to avoid the cost and confusion that will result from the SBE's actions. If voters receive an oath form with their absentee ballot, they may immediately decide not to vote in the primary. Any subsequent mailings from the SBE to "correct" the issue would likely be ignored. In other words, once the horse is out of the barn, the Court will have little power to corral it. In all events, time is of the

essence because absentee voters need to know whether they can vote and whether they will be forced to sign the loyalty pledge.

*Second*, no interested party will suffer harm from an injunction.  The SBE will no doubt argue that it is merely effectuating the will of the RPV, who in turn will argue it wants to protect the integrity of the primary by ensuring only Republicans vote.  If the party was so concerned about Republican imposters, it should have opted to run its own primary or convention, not one funded by the taxpayers.  Moreover, it is not even clear the oath will keep out political pretenders.  If Democrats are dead set on infiltrating with the Republican Primary, it is unlikely a loyalty oath will deter them.  Indeed, it may become a badge of honor.

*Third*, the public interest is in Plaintiffs' favor.  The public has an interest in election day (and absentee voting) running smoothly without the threat of chaos at the polls, long lines, and potentially multiple ballots being sent to absentee voters.  While it is true that states have "a strong interest in their ability to enforce state election law requirements," *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011), they have no interest in enforcing an unconstitutional rule.  Moreover, the public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4, (2006) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).  "That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Hunter*, 635 F.3d at 244.  Finally, the fact that absentee ballots are scheduled to go out imminently magnifies the public interest; and this issue must be resolved immediately.

## CONCLUSION

For all the above reasons, the loyalty oath is illegal on at least four different bases and should be enjoined immediately.  But not only is the RPV and SBE's transparent attempt to

discriminate against poor and minority voters illegal, it is also un-Virginian.  As James Madison—one of the greatest Virginians to ever live—wrote:  "Who are to be the electors of the Federal Representatives?  Not the rich more than the poor; not the learned more than the ignorant; not the haughty heirs of distinguished names, more than the humble sons of obscure and unpropitious fortune.  The electors are to be the great body of the people of the United States."  THE FEDERALIST, No. 57 (Cooke ed. 1961), at 385.  James Madison was correct.

The urgency of this matter and the importance of the constitutional rights implicated in this case require that the SBE be enjoined from requiring any voter to sign the oath form as a condition of voting in the Republican Presidential Primary while this case is pending.  Your Honor accordingly should not hesitate in granting Plaintiffs' motion for an injunction pending appeal, or at the very least an administrative injunction, enjoining the inclusion of the loyalty oath in absentee ballots being mailed, until the Court can decide the motion for an injunction pending appeal.

Dated: January 14, 2016                    Respectfully submitted,


                                           */s/* Chester Smith
                                           Chester Smith (VSB 23241)
                                           Smith Law Group, PLLC
                                           293 Independence Boulevard, Suite 231
                                           Virginia Beach, VA 23462
                                           Phone: (757) 490-3181
                                           Email: chucsmit@live.com

                                           *Counsel for Stephen A. Parson, Leon Benjamin, and Bruce L. Waller Sr.*

## <u>CERTIFICATE OF SERVICE</u>

I, Chester Smith, am a member of the Bar of this Court.  I hereby certify that on this 14th day of January, 2016, I caused the foregoing to be electronically filed with the Clerk of Court by email.  I also emailed the filing to the following:

J. Duncan Pitchford, Asst. Atty. Gen.
Counsel for Defendants
Office of the Virginia Attorney General
900 East Main Street
Richmond, Virginia 23219

I, Chester Smith, further certify that I have served the following by first class United States Mail, postage prepaid:

John L. Findlay, Registered Agent
Republican Party of Virginia, Inc.
115 East Grace Street
Richmond, Virginia 23219

I, Chester Smith, further certify that I have served a copy of the foregoing by electronic mail upon counsel for the Republican Party of Virginia, Inc., Chris Marston, at chris.marston@gmail.com.

Dated: January 14, 2016                    Respectfully submitted,


/s/ Chester Smith
Chester Smith (VSB 23241)
Smith Law Group, PLLC
293 Independence Boulevard, Suite 231
Virginia Beach, VA 23462
Phone: (757) 490-3181
Email: chucsmit@live.com

*Counsel for Stephen A. Parson, Leon Benjamin, and Bruce L. Waller Sr.*